JS - 6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
| Title | Ceradyne, Inc. v. RLI Insurance Company et al | | |

Present: The Honorable | **James V. Selna, U.S. District Court Judge**

| Lisa Bredahl | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS]** <u>Order Regarding Cross-Motions for Summary Judgment</u>

Before the Court are two cross-motions for summary judgment. Liberty Mutual Insurance Company ("Liberty") filed a motion for summary judgment on all claims. (Dkt. No. 108.) Ceradyne, Incorporated ("Ceradyne") opposed the motion, (Dkt. No. 111), and Liberty replied (Dkt. No. 114). Ceradyne similarly moved for summary judgment on all of its and Liberty's claims, (Dkt. No. 109); Liberty opposed the motion, (Dkt. No. 112), and Ceradyne responded (Dkt. No. 113). The parties appeared before the Court for oral argument on October 24, 2022.

For the following reasons, the Court **GRANTS** Liberty's motion and **DENIES** Ceradyne's motion.

### I. BACKGROUND

The following facts are not in dispute.

*A.     The Policies*

In 2012, Ceradyne purchased a "Directors and Officers" liability insurance policy

JS - 6

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:21-cv-6373 JVS (KES)                Date   October 31, 2022

Title   Ceradyne, Inc. v. RLI Insurance Company et al

from Liberty.[1]  (Dkt. No. 112-1 ¶¶ 2-4.)  At the time of the policy's issuance, Ceradyne was a corporation headquartered in California and incorporated in Delaware.  (Dkt. No. 112-1 ¶ 1; Dkt. No. 111-5 ¶ 20.)  The Liberty policy was brokered in California by a California entity and was underwritten by Liberty from its Los Angeles, California office. (Dkt. No. 111-5 ¶ 17.)

The parties do not dispute the language of the policy.  The policy outlines three Insuring Agreements: Insuring Agreement A, Insuring Agreement B, and Insuring Agreement C.  Only Agreements A and B are applicable to the present motions, as Agreement C pertains to loss with regard to claims arising from alleged securities violations against Ceradyne itself.  Because the Ceradyne directors were the only remaining defendants at the time of the Settlement, Insuring Agreement C does not apply. (See Dkt. No. 113 at 18.)

Insuring Agreement A, titled "Insured Person Coverage," states in relevant part:

This policy shall pay the Loss of any Insured Person that no Organization has indemnified or paid, and that arises from any:
> (1) Claim (including any Insured Person Investigation) made against such Insured Person (including any Outside Entity Executive) for any Wrongful Act of such Insured Person. . .

(Dkt. No. 108-4 at 10.)

Insuring Agreement B, titled "Indemnification Of Insured Person Coverage," states in relevant part:

This policy shall pay the Loss of an Organization that arises from any:
> (1) Claim (including any Insured Person Investigation) made against any Insured Person (including any Outside Entity Executive) for any Wrongful Act of such Insured Person . . .

---

[1]  Ceradyne also purchased similar Directors and Officers liability policies from National Union Fire Insurance Company and RLI Insurance Company.  Neither of these policies are at issue in the present case.

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

but only to the extent that such Organization has indemnified such Loss of, or paid such Loss on behalf of, the Insured Person.

Id. Section 13 of the policy defines several key terms. Words that are capitalized through the policy are defined in this section.

The policy defines "Insured" as any "Insured Person" or "Organization." (Id. at 29.) The definition of "Organization" includes the "Named Entity," which is Ceradyne. (Id. at 31; Dkt. No. 109 at 10; Dkt. No. 108 at 19.) An "Insured Person" includes any "Executive of an Organization," "Employee of an Organization." (Id.) Accordingly, it is undisputed that Ceradyne's directors and officers, as Insured Persons, and Ceradyne, as the Organization, are covered by this policy.

The policy defines "Loss" as "damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), Defense Costs, Crisis Loss, Derivative Investigation Costs." (Dkt. No. 108-4 at 31.) This affirmative definition is followed by several exclusions, including the "Bump-Up Exclusion" at the heart of the parties' dispute. The language of clause states:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to Defense Costs or to any Non-Indemnifiable Loss in connection therewith.

(Dkt. No. 108-4 at 32.)

## B.   *The Underlying Litigation*

On October 1, 2012, Ceradyne and 3M announced their intent to enter into a merger agreement in which Cyborg, a subsidiary of 3M, would commence a tender offer to acquire all outstanding shares of Ceradyne at $35.00 per share, followed by a short-

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

form merger in which the remaining shareholders would also receive $35.00 per share. (Dkt. No. 112-1 ¶ 14; Dkt. No. 111-5 ¶ 18.)

Shortly after this announcement, several lawsuits were filed.  Two plaintiffs filed a lawsuit in the Court of Chauncery in Delaware.  (Id. ¶ 17.)  Following the Delaware court's denial of the plaintiffs' motion to expedite discovery, the Delaware plaintiffs dismissed their complaints without prejudice.  (Id. ¶ 20.)  Around the same time, two individuals filed separate actions in the Orange County Superior Court, which were later consolidated, seeking injunctive relief.  (Dkt. No. 112-1 ¶¶ 15-16, 18.)  The consolidated case was initially settled for additional public disclosures and a fee award without any pre-closing increase of the $35 per share tender-offer.  (Id. ¶ 21.)  However, the superior court rejected the settlement after the 3M transaction closed.  (Id. ¶ 27.)  The plaintiffs subsequently amended their complaints alleging breach of fiduciary duty of the Ceradyne directors by, among other things, intentionally undervaluing the company and consciously agreeing to sell Ceradyne to 3M for a knowingly inadequate price.  (Dkt. No. 111-5 ¶ 21, 34; Dkt. No. 112-1 ¶ 32.)

The California litigation was settled in 2017, resulting in a "Net Settlement Fund," defined as the $11.3 million "Settlement Fund" . . . less any Fee and Expense Award, Administrative Costs, and any award to the Plaintiffs for the representation of the Class." (Dkt. No. 111-5 ¶ 45.) The settlement was to be "allocated on a per-share basis" to the Class members.  (Id. ¶ 46.)

*C.     Procedural History*

Following the settlement of the Underlying Litigation, Ceradyne sought coverage from AIG, RLI, and Liberty, pursuant to the respective Directors and Officers liability policies it had with each insurer.  AIG paid $5 million toward the settlement, but RLI and Liberty denied coverage based on the Bump-Up Clause.  (Dkt. 111-5 ¶¶ 62-64.) Ceradyne filed suit in the District of Delaware alleging breach of contract and seeking declaratory judgment.  Liberty filed suit for declaratory judgment in this district.  This Court granted Ceradyne's motion to transfer the Liberty action to the District of Delaware (see 8:20-cv-1007, Dkt. No. 33) where the District of Delaware consolidated the actions. The consolidated case was transferred back to this Court in August 2021.  (See Dkt. No. 40.)

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

## II. LEGAL STANDARD

Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim. Fed. R. Civ. P. 56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . ." (internal quotation marks omitted)).

The moving party has the initial burden of establishing the absence of a material fact for trial. Id. at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Furthermore, "Rule 56[(a)]² mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. To defeat summary judgment, the nonmoving party who bears the burden at trial must present more than a "mere scintilla" of "affirmative evidence." Galen v. Cnty. of L.A., 477 F.3d 652, 658 (9th Cir. 2007) (citing Anderson, 477 U.S. at 248). Therefore, if the nonmovant does not make a sufficient showing to establish the elements of its claims, the Court must grant the motion.

Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits. Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. See id. at 1137.

---

² Rule 56 was amended in 2010. Subdivision (a), as amended, "carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word — genuine 'issue' becomes genuine 'dispute.'" Fed. R. Civ. P. 56, Notes of Advisory Committee on 2010 amendments.

JS - 6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

The Court has only relied on admissible evidence in determining the outcome of this motion. When the order cites evidence to which the parties have objected, the objection is impliedly overruled. Additionally, the Court declines to rule on objections to evidence upon which it did not rely.

## III. CHOICE OF LAW

As a threshold matter, the Court must decide whether to apply California or Delaware law when interpreting the policy's terms. Ceradyne advocates for the application of Delaware law (Dkt. No. 109 at 5-8) while Liberty contends the Court should apply California law (Dkt. No. 108 at 12-15.)

A federal court sitting in diversity applies the forum state's choice of law analysis to resolve conflicts. See Hyan v. Hummer, 825 F.3d 1043, 1047 (9th Cir. 2016) ("Under the Erie doctrine . . . federal courts sitting in diversity apply state substantive law and federal procedural law.") (internal quotations and citation omitted). This relatively simple rule is complicated here by the fact that one case originated in California, while the other originated in Delaware. Where venue is transferred under 28 U.S.C. § 1404, the choice of law rules from the transferor court continue to apply to that action. Van Dusen v. Barrack, 376 U.S. 612, 632-37 (1964). Accordingly, California's choice-of-law principles would apply to the California action, while Delaware's principles would apply to the case originating in Delaware.

Further muddying the waters is the fact that these cases have been consolidated into a single action. While consolidated cases do not lose their individual attributes, when the cases involve separate actions involving identical issues between the same parties, courts have decided to choose one state's law and apply it throughout. See Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 600 (4th Cir. 2004). Although the Ninth Circuit has not directly addressed how courts should determine which state's law applies in consolidated cases, other circuits adopted a "balancing of interests" approach.

In a consolidated case when there are two states whose choice of law rules would apply under the Van Dusen formula, and those choice of law rules result in two states' substantive laws being applied, then the court

JS - 6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

determines which state's substantive law applies by balancing the interests of each state in having its law apply.

Nestle U.S.A. v. Travelers Cas. & Sur. Co., 1998 U.S. Dist. LEXIS 17287, at *4 (C.D. Cal. Oct. 26 1998) (citing Boardman Petroleum v. Federated Mut. Ins. Co., 135 F.3d 750, 753 (11th Cir. 1998). See also Volvo, 386 F.3d at 600; Bott v. Am. Hydrocarbon Corp., 441 F.2d 896, 899-900 (5th Cir. 1971).

The Restatement (Second) of Conflict of Laws ("Restatement") is instructive in balancing the states' respective interests. Both California and Delaware courts rely on the Restatement in analyzing conflicts of laws. See Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A.3d 457, 464 (Del. 2017); Nedlloyd Lines B.V. v. Superior Ct., 3 Cal. 4th 459, 466 (1992). Consequently both California and Delaware courts have utilized the "most significant relationship" test in Section 188 of the Restatement. See Chesapeake Utilities Corp. v. American Home Assur. Co., 704 F.Supp. 551, 555-56 (D. Del. 1989); Ribbens Intern., S.A. de C.V. v. Transport Intern. Pool, Inc., 47 F. Supp. 2d 1117, 1120 (C.D. Cal. 1999). Section 188 outlines five factors courts may consider when, in the absence of a choice of law provision in the parties' contract, a court must determine which state's law to apply. Restatement § 188(2). The non-exhaustive list of factors are:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Applying these principles, the Court finds that, on balance, California has a greater interest in having both its law applied in this case. The first two factors support applying California law. It is undisputed that the insurance policies were negotiated, brokered, underwritten, issued, and delivered in California to Ceradyne which was, at the time, headquartered in California. (Dkt. No. 111-5 ¶¶ 11-12; Dkt. No. 108-4 at 6.) See Boardman, 135 F.3d at 753 (applying the law of the state where the insurance contracts were made); Nestle U.S.A., 1998 U.S. Dist. LEXIS 17287, at *4-5 (same).

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|----------|------------------------|------|------------------|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|-------|-----------------------------------------------|

The third and fourth factors favor applying California law.  While the policy itself does not designate a "place of performance," it does make one reference each to California and Delaware law.  The policy indicated that Delaware's law should apply in the case of alternative dispute resolution.  Dkt. No. 108-4 at 24.  See Pfizer Inc. v. Arch Ins. Co., 2019 WL 3306043, at *8 (Del. Sup. Ct. July 23, 2019) (weighing the presence of an alternative dispute resolution clause contemplating Delaware law in favor of applying Delaware law to the lawsuit).  The insurance policy also contained a California-specific endorsement, indicating the parties' contemplation of California law in some capacity. See Frontier Oil Co. v. RLI Ins. Co., 153 Cal. App. 4th 1436, 1461-62 (2007) (weighing a policy endorsement referencing California law in favor of applying California law to the lawsuit).  Neither of these references to state law constitute a choice of law provision, and they therefore cancel each other out in this aspect.

The parties further contend that Ceradyne's state of incorporation or its headquarters should control the place of performance inquiry.  Ceradyne argues that the place of performance was intended to be Delaware, as that is Ceradyne's state of incorporation.  (Dkt. No. 109 at 7-8; Dkt. No. 111 at 5.)  See Arch Ins. Co. v. Murdock, 2018 WL 1129110, at *10-11 (Del. Sup. Ct. Mar. 1, 2018) ("when the conduct of a corporation's directors and officers is centrally implicated, the place of incorporation is important").  Conversely, Liberty asserts that California was intended to be the place of performance because that was Ceradyne's principle place of business at the time the parties entered into the agreement.  (Dkt. No. 108-4 at 6; Dkt. No. 108 at 12-13.)  See Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A. 3d 457, 468 (Del. 2017) ("[t]he appropriate time period to consider is the time at which the contract was formed");  Arrow Elec., Inc. v. Liberty Mut. Ins. Co., 775 F. App'x. 305, 306-07 (9th Cir. 2019) (intended place of performance of liability policy "is generally the jurisdiction where the operations are located because this is where the insurer and insured expect a third-party to file a complaint against the insured.").

On balance, the Court finds that the third and fourth factors weigh in favor of applying California law.  In Frontier Oil Corporation v. RLI Insurance Company, the court confronted the issue of how to determine the place of performance when one is not specified in the liability insurance policy.  153 Cal. App. 4th 1436, 1461.  The court's analysis on this point focused on where the parties would have anticipated a lawsuit to originate such that the insurance company's performance would be necessary.  Id.

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

Although that case dealt with defense liability insurance, and the action here entails indemnity insurance, the reasoning applies with full force.

In this case, the place the parties would have anticipated a lawsuit to originate is indisputably California. Not only was Ceradyne's principle place of business in California such that actions giving rise to a lawsuit would occur in this state, the underlying lawsuits that are the subject of this litigation were, in fact, brought in California. Most of the underlying lawsuits for which coverage is sought were filed, prosecuted, and settled in California. (Dkt. No. 112-1 ¶¶ 15-18.) One underlying lawsuit was originally filed in Delaware but the plaintiffs in that case ultimately dismissed their complaints. (Id. ¶¶ 19-20.) See Nestle U.S.A., 1998 U.S. Dist. LEXIS 17287, at *4-5 (applying California law where underlying lawsuit was in California). Further, although the type of insurance at issue is supplemental Directors and Officers liability insurance, that does not significantly alter the calculus. In Calamos, the court held that "Delaware's law ultimately determines whether a director or officer of a Delaware corporation has misbehaved vis-à-vis the corporation, its shareholders, and its investors." Calamos Asset Mgm't., Inc. v. Travelers Casualty and Surety Co. of Am., 2020 WL 3470473, at *4 (D. Del., June 25, 2020). However, the parties are not asking this Court to determine Ceradyne's directors' or officers' liability. The California state court has already done so. Rather, the task before the Court is to interpret the language of the parties' liability insurance policy to determine whether it applies to the state court judgment.

Finally, the fifth factor equally supports both California and Delaware. As the Court has previously addressed the parties' respective arguments regarding Ceradyne's state of incorporation and principle place of business, the Court will not belabor the point. In short, Ceradyne argues that their place of incorporation should be given significant weight, as the subject matter of the insurance policy concerns Directors' and Officers' liability. (Dkt. No. 109 at 8.) Ceradyne relies heavily on RSUI Indemnity Company v. Murdock on this point. In Murdock, the Delaware Supreme Court opined that where "the choice of law is between [the company's] headquarters or [] state of incorporation, the state of incorporation has the most significant interest." 248 A. 3d 887, 900 (Del. 2021). However, this point is not dispositive as it is only one of five factors the court considers. Moreover, Ceradyne's principle place of business was in California at the time the parties entered into the contract. See Chemtura, 160 A. 3d at 468 ("[t]he appropriate time period to consider is the time at which the contract was formed, and the expectations of the

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    2:21-cv-6373 JVS (KES)                           Date    October 31, 2022

Title    Ceradyne, Inc. v. RLI Insurance Company et al

parties about the contacts that would arise from the contract at that time). (Dkt. No. 108-4 at 6.)

However, there is little conflict on the first step of the analysis, as both Delaware and California employ the same choice-of-law analysis pursuant to Section 6 of the Restatement (Second) of Conflicts of Laws. The Delaware Supreme Court held that "Delaware follows the Second Restatement's 'most significant relationship' analysis when considering choice of law in contract disputes." Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A.3d 457, 464 (Del. 2017). The court laid out three components to the choice-of-law analysis: "i) determining if the parties made an effective choice of law through their contract; ii) if not, determining if there is an actual conflict between the laws of the different states each party urges should apply; and iii) if so, analyzing which state has the most significant relationship" to the contract and the parties to the contract. Id.

Accordingly, the Court will apply California substantive law to determine the remaining issues.

## IV. DISCUSSION

Insurance policies are contracts "to which the ordinary rules of contractual interpretation apply." Bank of the W. v. Super. Ct., 2 Cal. 4th 1254, 1264. "The overriding goal of contract interpretation is to give effect to the parties' mutual intentions as of the time of contracting." Van Ness v. Blue Cross of Cal., 87 Cal. App. 4th 364, 372 (2001) (citing Cal. Civ. Code, § 1636.). "Where contract language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further." Id. (citing Cal. Civ. Code §§ 1638, 1639).

The language of the plan must be construed to give effect to every term. Mirpad, LLC v. Cal. Ins. Guarantee Ass'n, 132 Cal. App. 4th 1058, 1072 (2005). Courts "read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" Van Ness, 87 Cal. App. 4th at 372 (quoting Cal. Civ. Code § 1641). Thus, the Court will "look to the agreement's language in context and construe each provision in a manner consistent with the whole such that none is rendered nugatory. Dupree v. Holman Prof'l Counseling Ctrs., 572 F.3d 1094, 1097 (9th

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

Cir. 2009). At issue in this case is an indemnity insurance policy. "The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved." Buss v. Super. Ct., 16 Cal. 4th 35, 45 (1997).

### A.    Insuring Agreement B

Liberty argues first that it is not liable under the policy because 3M, not Ceradyne, paid the settlement. (Dkt. No. 108 at 17.) Insuring Agreement B requires Liberty to "pay the Loss of an Organization that arises from" a claim "but only to the extent that such Organization has indemnified such Loss of, or paid such Loss on behalf of, the Insured Person. (Dkt. No. 108-4.)

Liberty relies on Pan Pacific Retail Properties, Inc. v. Gulf Insurance Company in support of its argument on this point. 471 F.3d 961 (9th Cir. 2006). In that case, Western Properties and Pan Pacific Properties entered into a merger agreement whereby Pan Pacific acquired all shares of Western, paid in Pan Pacific Stock. Id. at 964. Western shareholders subsequently brought suit in state court alleging, among other claims, that Western, Pan Pacific, and their directors and officers were liable for breach of fiduciary duty by failing to negotiate the highest possible price for the Western shares. Id. The shareholders ultimately succeeded in their action and were awarded $975,000 in addition to $15,000 for administrative and notice costs. Id. at 965. Pan Pacific subsequently paid the settlement amount according to its agreement to "pay all claims arising from the merger." Id.

Western later sought indemnity from its insurer, Twin City Fire Insurance Company which had issued a Directors' and Officers' Liability and Company Indemnification Policy. Id. In addition to asserting that the settlement constituted additional consideration paid in connection with the merger, Twin City argued that Western had not suffered any damages because Pan Pacific had paid the settlement. Id. Both the district court and Ninth Circuit agreed. The district court noted that "Twin City issued a Directors and Officers [] policy to Western and its directors and officers . . . not . . . to Pan Pacific or its directors and officers." Pan Pac. Retail Prop., Inc. v. Gulf Ins. Co., 2004 WL 2958579, at *10 (S.D. Cal. 2004). Consequently, because Twin City's insured did not pay the settlement, it did not suffer any "loss" under the policy. Id.

JS - 6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

On appeal, the Ninth Circuit affirmed the district court's grant of summary judgment to Twin City "on the ground that Western was fully compensated from any loss by Pan Pacific's payment of the settlement and any other costs or expenses." Id. at 964. The court noted that the insurance policy's requirement that Western "'has indemnified' its directors and officers appears to require that [Western] must in fact make payments on behalf of its officers and directors." Id. at 972.

The facts of the case now before this Court are nearly identical to those in Pan Pacific. Liberty issued a Directors and Officers indemnification insurance policy to Ceradyne. Dkt. No. 112-1 ¶ 4. Insuring Agreement B, titled "Indemnification of Insured Person Coverage" provides that the policy will pay for Loss from a Claim if the Organization has indemnified or paid such Loss on behalf of the Insured Person. This language indicates that the policy required Ceradyne to "in fact make payments on behalf of its officers and directors." Pan Pac., 471 F.3d at 972. The uncontroverted evidence in the record is that the source of funds used to pay the settlement came from 3M, not Ceradyne. (Dkt. No. 112-1 ¶ 67; Dkt. No. 108-58 at 6.)

Ceradyne argues that Pan Pacific is inapposite because, where Western was fully merged into Pan Pacific and therefore did not exist as a separate legal entity, Ceradyne still exists and was merely acquired by 3M. (Dkt. No. 111 at 22.) However, this is a distinction without a difference. The policy's language requires that Ceradyne itself, as the "Organization," have paid out the money for which it seeks indemnification. The evidence before the Court indicates that 3M, not Ceradyne, paid the settlement. Indeed, the fact that Ceradyne still exists and was not subsumed into 3M further supports this finding. In Pan Pacific, the court held Western to the language of its policy notwithstanding the fact that it had merged with another company after the settlement was paid. Here, while Ceradyne was acquired by 3M six years after Ceradyne reached a settlement in the underlying lawsuits, it "still exists as a wholly-owned subsidiary of 3M." (Dkt. No. 111 at 22.) Accordingly, even more than the parties in Pan Pacific, Ceradyne could have used its own funds to pay the settlement. It did not do so.

Accordingly, the Court finds that Liberty is not liable to Ceradyne for payment under Insurance Agreement B.

### B.    Insuring Agreement A

JS - 6

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |

| | |
|---|---|
| Title | Ceradyne, Inc. v. RLI Insurance Company et al |

Although Liberty may not be liable to Ceradyne under Insuring Agreement A for the same reasons the Court found it is not liable under Insuring Agreement B, such a finding is not necessary.  Liberty is not liable to Ceradyne under Insuring Agreement A for the independent reason that the settlement does not constitute "Loss" contemplated by the policy as it falls under the "Bump-Up Exclusion."

As an initial matter, Ceradyne asserts that Liberty bears the burden of proving that the settlement does not fall within the "Bump-Up Exclusion."  However, this is a misstatement of the law.  As with any contract, a claim for breach of an insurance contract under California law requires the plaintiff to prove: (1) the existence of the contract; (2) plaintiff's performance or excuse for nonperformance of the contract; (3) defendant's breach of the contract; and (4) resulting damages.  Raisin Bargaining Ass'n v. Hartford Cas. Ins. Co., 715 F. Supp. 2d 1079, 1085 (E.D. Cal. 2010).  Regarding the first and second elements, in "an insurance coverage action, the insured has the burden to prove that the claim falls within the basic scope of coverage."  Pan Pac., 471 F.3d at 970–71;  Collin v. Am. Empire Ins. Co., 21 Cal. App. 4th 787, 803 (1994).  However, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language."  MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 643 (2003).  Accordingly, Ceradyne bears the burden of showing that the settlement falls within the basic scope of coverage, while the burden of showing that the Bump-Up Exclusion applies lies with Liberty.

The crux of the parties' dispute is what constitutes a "loss" under the policy.  This requires deciding (1) what does the Bump-Up Exclusion mean; (2) whether the underlying lawsuits fall into the type of claims contemplated by the Bump-Up Exclusion; and (3) whether the settlement effectively increased the purchase price.

i.     Meaning of the Bump-Up Exclusion

Although the parties hotly dispute what the Bump-Up Exclusion means, they do not dispute the language itself.  As reproduced above, the Bump-Up Exclusion states:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is

JS - 6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to Defense Costs or to any Non-Indemnifiable Loss in connection therewith.

Ceradyne argues that, when read in the context of the entire contract, the Bump-Up Exclusion was not intended to exclude coverage for the type of transaction that occurred in this case: Ceradyne being acquired by another entity, as opposed to Ceradyne being the acquirer. (Dkt. No. 109 at 11-13.)  However, this interpretation does not capture the breadth of the Exclusion's language.  Ceradyne asserts that, where the insurance companies intended to address a "Transaction," defined as Ceradyne selling all of substantially all of its assets to another entity, it did so explicitly.  (Id. at 11.)  Ceradyne is correct; however this does not support its argument.  For example, Section 10, "Changes to Insureds," states that, "[i]n the event of a Transaction . . . this policy shall continue . . . prior to the effective time of the Transaction, but there will be no coverage afforded by any provision of this policy . . . after the effective time of the Transaction."  (Dkt. No. 108-4 at 20.)  In this context, the specific inclusion of "Transaction" comports with the purpose of that section.  In the event of a "Transaction," resulting in Ceradyne being acquired, the insurance policy would not continue.  Conversely, in the case of Ceradyne acquiring another company, the insurance policy would remain in full effect.  This is further corroborated by other sections in the policy that specifically mention "Transaction."  (See, e.g., id. at 17 ("Discovery" section mentioning that the rights contained in that section terminate unless the Insurer receives written notice within 30 days of "cancellation, nonrenewal, or Transaction").)

The Bump-Up Exclusion does not include a mention of a "Transaction" because, according to Ceradyne and basic principles of contract interpretation, it was not intended to be there.  See Bank of the W. v. Super. Ct., 2 Cal. 4th 1254, 1264 (1992) (noting that where "contractual language is clear and explicit, it governs").  Although the Court previously decided that California law controls in this case, Ceradyne urges the Court to consider a Delaware Superior Court case, Northrop Grumman Innovation Systems Incorporated v. Zurich Insurance Company.  2021 WL 347015, *21 (Sup. Ct. Del. Feb. 2, 2021).  The court in that case analyzed a similar Bump-Up Exclusion and held that it did not apply to the transaction at issue in that case because "the [policyholder], which

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |

| | |
|---|---|
| Title | Ceradyne, Inc. v. RLI Insurance Company et al |

dissolved, didn't acquire all or substantially all the ownership of anyone in the end." Id. at *21. However, language Ceradyne quotes is in the context of the court determining that the transaction was a merger, not an acquisition, as required by the Bump-Up Exclusion's plain language. The Northrop court held that the policyholder entered into a merger agreement because it did not retain a separate legal existence once the transaction was completed, and stockholders of both companies voted on the transaction, the "hallmark[s] of a merger." Id. The Bump-Up Exclusion at issue therefore applied "solely to a special type of transaction: an acquisition of all or substantially all of an entity's assets or ownership." Id. Accordingly, the court noted that "[i]f the Policies were intended to exclude all transaction-based Claims . . . then the drafters would have written them that way." Id.

In Ceradyne's case, the Bump-Up Exclusion also specifies that it applies to "acquisitions." However, unlike in Northrop, the transaction at issue here was an acquisition, a fact which is not in dispute. Ceradyne only contends that the Court should narrow the term "acquisition" to encompass only those transactions "where the insured was the party paying to acquire ownership or assets." (Dkt. No. 109 at 10.) However, the Exclusion's unambiguous language does not lend itself to such a narrow interpretation. If the policies were intended to exclude the specific type of acquisition Ceradyne proffers, the drafters would have done so. This interpretation conforms with the purpose of such Bump-Up Exclusions - carving out an exception for when a lawsuit results in the "effective increase" of the purchase price of an entity, whether the insured entity is the acquirer or the acquired. See Gunderson v. Fire Ins. Exch., 37 Cal. App. 4th 1106, 1118 (1995) (a proffered interpretation of an insurance policy may not serve to rewrite a policy "to bind the insurer to a risk it did not contemplate and for which it has not been paid").

The Court reaches a similar conclusion with regard to Ceradyne's other textual arguments. Ceradyne argues that because the Exclusion does not modify the term "an entity" with "Named Entity," then it could not mean that Ceradyne could be the subject of an acquisition such that the Exclusion would apply. However, the intentional omission of the defined term "Named Entity" in this context, when it was used elsewhere, implies that this clause was intended to be read broadly and encompass not only the "Named Entity," but any other entity as well. See Bay Cities Paving & Grading v. Lawyers Mut. Ins. Co., 5 Cal. 4th 854, 868 (1993) (In drafting a contract, a word with a broad meaning

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:21-cv-6373 JVS (KES)            Date   October 31, 2022

Title        Ceradyne, Inc. v. RLI Insurance Company et al

"may be used for that very reason—its breadth—to achieve a broad purpose").

The Court declines to accept Ceradyne's invitation to read words in and out of the Bump-Up Exclusion that simply are not present.  The Court finds that the language of the Bump-Up Exclusion plainly excludes from the general Loss provision payments made as a result of a claim alleging that the price of an acquisition is inadequate.

ii.     The Underlying Lawsuits Alleged Inadequate Consideration Paid for Ceradyne

Having found that the Bump-Up Exclusion applies to lawsuits alleging inadequate consideration for the acquisition of an entity, be it Ceradyne or not, the next question is whether the underlying lawsuits here did so.  The uncontroverted evidence in the record plainly indicates that the underlying actions did just that.

First, the allegations are clear that the plaintiffs sought compensation for Ceradyne's directors' undervaluing how much Ceradyne was worth in the transaction with 3M, resulting in inadequate consideration paid for Ceradyne.  One lawsuit specifically alleged that Ceradyne's directors had "intentionally disregarded Ceradyne's intrinsic value," "agreed to sell the Company to 3M for a knowingly unfair price."  (Dkt. No. 108-7 ¶¶ 3, 9.)  That complaint further alleges that the common questions of the class include "whether Defendants breached their fiduciary duty to secure and obtain the highest value reasonably attainable . . . in connection with the Transaction" and "whether consideration paid to Plaintiffs and the Class in the Transaction was unfair and inadequate."  (Id. ¶ 27(b), (d).)  The complaint filed by Ceradyne shareholder City of Hialeah Employees Retirement System contained near-identical allegations.  (See Dkt. No. 108-8 ¶¶ 3, 5, 9.)  Accordingly, the undisputed facts are clear that these lawsuits alleged that the "price or consideration paid . . . for the acquisition or completion of the acquisition of all or substantially all the ownership interest in . . . an entity is inadequate." (See Dkt. No. 108-4 at 31.)

In this regard, Ceradyne relies again in large part on a Northrop to support the proposition that the Bump-Up Exclusion cannot apply because the lawsuits did not allege only inadequate consideration.  2021 WL 347015.  The settlement in that case resolved a suit alleging that a misleading joint proxy report induced shareholders to vote their shares

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

in favor of an agreement and accept inadequate consideration for their shares.  Id. at *20.  The Northrop court in that case noted that the complaint was "primarily" about the fiduciaries' "dissemination of a materially false and misleading Joint Proxy Statement . . . used to obtain approval in the merger," not inadequate consideration.  Id. at *20.

The present case is much more similar to Onyx Pharmaceuticals Inc. v. Old Republic Insurance Company. 2020 WL 9889619 (Cal. Super. Oct. 1, 2020).  In that case, the court was faced with a Directors and Officers insurance policy containing a Bump-Up Exclusion with identical language as the Exclusion in Ceradyne's policy.  Id. at *4.  Amgen acquired Onyx in an all-cash transaction through which Onyx shareholders received $125 per share.  Id. at *2.  The shareholders in the underlying lawsuits alleged that Onyx's Directors and Officers breached their fiduciary duty by failing "to seek the highest price for Onyx shareholders in its sale process."  Id. (internal quotation marks omitted).  The court held that, because the "primary allegation" in the underlying lawsuit was that the "Board of Directors failed to obtain the highest price fo the sale of Onyx," the lawsuit sought an increase in the acquisition price.  Id. at *15.  Therefore, "the claim of the Onyx shareholders alleg[ing] that the price paid by Amgen for the acquisition of 100% ownership of Onyx (which is an entity) at $125 per share was inadequate, i.e., was less that the highest price that might reasonably be obtained, and thus the Claim for indemnity of Onyx for the settlement payment is not covered."  Id.

Here, the underlying lawsuits alleged breaches of fiduciary duty almost exclusively based on Ceradyne's directors undervaluing the company and accepting inadequate consideration for the acquisition.  Indeed, even Ceradyne's insurance broker at the time of the underwriting of the policy similarly understood the lawsuits to fall under the Bump-Up Exclusion.  (See Dkt. No. Dkt. Nos. 95-96 (emails from Ceradyne's insurance broker describing the underlying lawsuits as "bump-up" claims).)  Additionally, the Court declines to read in the word "only" to the Bump-Up Exclusion's unambiguous language.  See Joy Global Inc. v. Columbia Casualty Co., 555 F. Supp. 3d 589, 595 (E.D. Wis. 2021) (declining to adopt the Northrop court's finding that the exclusion applied to claims that "only" alleged that the consideration exchanged was inadequate, and nothing else).

Moreover, the relief sought in the underlying cases was the amount by which the plaintiffs alleged Ceradyne's directors undervalued the company.  The plaintiffs'

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

attorneys advised potential class representatives of the purpose of the lawsuit as
attempting to "recoup the value for stockholders that defendants gave away when they
sold Ceradyne to 3M."  (Dkt. No. 108-88 at 3.)  The letter specifically states that the
damages sought would be "equal to the amount that the Company was actually worth less
the undervalued price of $35.00 per share that stockholders actually received in the
Transaction."  (Id.)

        Accordingly, the Bump-Up Exclusion applies to the underlying lawsuits here, each
of which alleged that Ceradyne's directors accepted inadequate consideration in the
acquisition.

        iii.    The Underlying Lawsuits "Effectively Increased" in the Consideration
                Paid for Ceradyne

        Having found that the Bump-Up Exclusion applies to the underlying lawsuits, the
Court must now address whether the lawsuits, in fact, effectively increased the
consideration paid for the acquisition of Ceradyne.  (See Dkt. No. 108-4 at 31 ("Loss
with respect to such Claim shall not include any amount of any judgment or settlement
representing the amount by which such price or consideration is effectively increased").)

        The parties disagree about whether the Bump-Up Exclusion applies if only some
allegations in the underlying litigation concerned inadequate consideration.  Ceradyne
asserts that the operative allegation was Breach of Fiduciary Duty and "alleged, among
other things, that the Defendant Directors 'impeded or erected barriers to discourage
other offers,' failed to investigate or knowingly ignored the financial advisor's potential
conflicts, and withheld information 'necessary for [stockholders] to make an informed
decision on whether or not to tender their shares.'" (Dkt. No. 109 at 20 (quoting Dkt. No.
108-7 ¶¶ 27(c), 30, 42, 68, 73-80.)  See Northrop, 2021 WL 347015, at *20 (declining to
apply Bump-Up Exclusion where underlying claim "wasn't exclusively about . . .
inadequate consideration).

        However, as noted above, the Bump-Up Exclusion's language does not state that
the Claim must "only" or "exclusively" allege inadequate consideration.  Rather, it states
that if a Claim alleges inadequate consideration, then the insurer will not pay the amount
of the settlement that "effectively increased" the amount paid. See Joy Global Inc. v.

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |

| | |
|---|---|
| Title | Ceradyne, Inc. v. RLI Insurance Company et al |

Columbia Cas. Co., 555 F. Supp. 3d 589 (E.D. Wis., 2021) (noting that a reasonable insured would understand the Bump-Up Exclusion to "exclude coverage for any amount of any settlement if: (1) the part of the Claim which was settled (2) alleges that the price or consideration paid or proposed to be paid for an acquisition transaction was inadequate, and (3) the proposed or completed transaction involved the acquisition of all or substantially all of the ownership interest in or assets of an entity"). Moreover, Ceradyne asserts that the operative complaint is labeled as an action "for Breach of Fiduciary Duty," and therefore cannot be a lawsuit alleging only inadequate consideration. (See Dkt. No. 111 at 15.) However, the breach of fiduciary duty the plaintiffs alleged was, in fact, the undervaluing of Ceradyne resulting in inadequate consideration paid. (See, e.g., Dkt. No. 108-8 ¶¶ 73-78 (alleging that specific directors breached their fiduciary duty to shareholders by accepting a "knowingly unfair price," "disregarding the known value of the Company," and failing to investigate financial advisors' potential conflicts resulting in accepting inadequate consideration).) Indeed, plaintiffs specified that, "as a result of Defendants' breaches of fiduciary duty, Plaintiff and the Class were stripped of their investments in Ceradyne for unfair consideration." (Id. ¶ 32.) Accordingly, the Court must decide what amount of the settlement "effectively increased" the consideration paid for Ceradyne's acquisition.

It is undisputed that the settlement amount was $11.3 million. (Dkt. No. 111-5 ¶ 5.) The parties present differing accounts of how the Court should view the result of that settlement. Ceradyne asserts that no portion of the settlement was paid to the Defendant Directors, notwithstanding the fact that they were included in the defined Class, as they were shareholders who received $35 per share as a result of Ceradyne's acquisition. (Dkt. No. 11 at 16.) Accordingly, Ceradyne's directors did not receive an increase in consideration; rather, the settlement was "an effective redistribution of a portion of the consideration paid to complete the 3M transaction from certain insider shareholders to the broader defined Class of shareholders." (Dkt. No. 109 at 22-23.)

However, the undisputed evidence indicates that the entire settlement was intended to, and in actuality did, increase the consideration paid to shareholders in relation to Ceradyne's acquisition. For instance, the Summary of Settlement Terms informed class members that they would receive up to $0.50 per share Ceradyne stock they owned, which was "in addition to the $35.00 per share consideration" they had previously received. (Dkt. No. 108-48 at 6.) Additionally, the Stipulation of Settlement defined the

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   2:21-cv-6373 JVS (KES)          Date   October 31, 2022

Title   Ceradyne, Inc. v. RLI Insurance Company et al

"Class" as those "who recived consideration for their shares in the sale . . . at the price of $35.00 per share." (Dkt. No. 108-44 ¶¶ 1.3.)

Perhaps the most convincing piece of evidence is the fact that neither Ceradyne nor its directors paid the settlement. Rather, the amount not covered by other insurance was paid out of 3M's bank account. (Dkt. No. 112-1 ¶ 67; Dkt. No. 108-58 at 6.) Therefore, just as with the original $35.00 per share, the additional $0.50 per share was paid by 3M, resulting in an effective increase of the consideration 3M paid to Ceradyne's shareholders for its acquisition of Ceradyne. See Onyx, 2020 WL 9889619, at *15 ("It is reasonable that the insurance carriers did not want to have insurance proceeds be a means of funding the purchase of assets by a corporation – which, as pragmatic matter, would be the result of insurance funds were paid to [Ceradyne], which is now wholly owned by its acquirer [3M].")

For these reasons, the Court finds that the settlement effectively increased the consideration paid for the acquisition of Ceradyne, and the Bump-Up Exclusion applied.

C.   *Defense Costs*

Finally, Ceradyne seeks the portion of the settlement proceeds that did not "effectively increase" the consideration paid - namely attorneys' fees, expenses, administration costs, and *cy pres* payments in the amount of $3,800,592.23. (See Dkt. No. 111 at 17-18.) Liberty argues that it is not liable to these costs because they are not tethered to an insurable loss. (See Dkt. No. 109 at 22.) Indeed, the case law supports the notion that "if the entire action alleges no covered wrongful act under the policy, coverage cannot be bootstrapped based solely on a claim for attorney fees." Health Net, Inc. v. RLI Ins. Co., 206 Cal. App. 4th 232, 257 (2012). See also Screen Actors Guild v. Fed. Ins. Co., 636 F. App'x 409, 410 (9th Cir. 2015) ("SAG is not entitled to coverage based solely on a claim for attorney's fees untethered to any insurable loss"); PNC Fin. Servs. Grp., Inc. v. Hous. Cas. Co., 647 F. App'x 112, 122-23 (3d Cir. 2016) (where class action settlement payment was excluded, attorney fees awarded from the common fund were also excluded).

Unlike in those cases, however, the Bump-Up Exclusion here explicitly carves out "Defense Costs . . . in connection" with the claim. (Dkt. No. 108-4 at 31.) Returning

JS - 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-6373 JVS (KES) | Date | October 31, 2022 |
|---|---|---|---|

| Title | Ceradyne, Inc. v. RLI Insurance Company et al |
|---|---|

again to the plain language of the contract, the Bump-Up Exclusion specifically contemplates that Defense Costs associated with Claims under this section are not part of the exclusion.  This reading comports with the purpose of such provisions - ensuring the insurance company is not funding the purchase of assets by a corporation.  As such, the Court finds the defense costs are payable to Ceradyne in the event Ceradyne paid such costs.  Cf. Safeway Stores, Inc. v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa., 64 F.3d 1282 (9th Cir. 1995) (awarding defense costs where the underlying defendant directly paid attorneys' fees).  However, as previously noted, Ceradyne did not directly pay any portion of the settlement, including any attorneys' fees or defense costs.  Accordingly, Ceradyne cannot recover such defense costs as it did not pay.

Finally, Liberty avers that, even if the Court found that the $3.8 million of defense costs were covered by the policies, the "Liberty policy would not be implicated given RLI's underlying $5 million limit."  (Dkt. No. 108 at 25.)  In response, Ceradyne argues that the Court should account not only for the $3.8 million in defense costs, but also an additional $5,547,799 in "special benefits."  (Dkt. No. 111 at 18.)  Ceradyne argues that the relief the shareholder plaintiffs sought in connection with these "special benefits" was for amounts "paid to the Defendant Directors for their respective stock options."  (Id.)  However, Ceradyne offers no evidentiary support for this argument, and the Court can find none.  Accordingly, the undisputed facts before the Court support a finding that the only portion of the settlement that did not contribute to an increase in the purchase price is $3.8 million in defense costs.  As such, this amount would not reach Liberty's policy and Liberty would not have any liability for it.

**V. CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Liberty's motion and **DENIES** Ceradyne's motion.

**IT IS SO ORDERED.**